***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Chapman with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. The employer/employee relationship existed between the named employee and named employer on or about September 26, 2003 the date of the alleged compensable injuries.
3. Food Lion was a self-insured employer.
4. The employer in this case is Food Lion and the carrier and/or claims administrator liable on the risk is Risk Management Services Incorporated.
5. The parties are able to agree upon employees' average weekly wage as of September 26, 2003 was $658.72 which results in a compensation rate of $439.17.
In addition, the parties stipulated into evidence the following:
1. Packet of documents labeled plaintiff's exhibits A through N, which includes medical records and reports, Industrial Commission forms, discovery responses and photographs.
2. Additional medical reports submitted October 10, 2006.
The Pre-Trial Agreement dated September 12, 2006, which was submitted by the parties, is incorporated by reference.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of hearing before the Deputy Commissioner, plaintiff was fifty-eight years old. He completed the tenth grade, but later obtained a GED. For thirty-three years, he worked as a meat cutter or butcher for multiple employers, including defendant Food Lion, for whom he worked a total of thirteen years. His second period of employment with defendant began on May 4, 1995. As a meat cutter, his duties included cutting meat, putting pre-packaged *Page 3 
meat on display in the deli, ordering meat, making up work schedules for the other employees in the meat department and unloading trucks.
2. The meat department was kept between forty-eight and fifty degrees in order to prevent the meat from spoiling. Plaintiff also had to periodically go inside the freezer. He spent the majority of his time at work cutting meat. Many of the cuts required him to use a large knife. However, there was a circular saw for cuts such as pork chops. In order to make them, he would have to lift the entire section of pork, which weighed more than twenty pounds, grip it forcefully and push it repeatedly through the blade.
3. Plaintiff is right handed. When cutting meat with a knife, he would grip the handle with his fingers and put his right thumb on top of the knife above the blade in order to push it through the meat. Cutting meat with a knife put considerable pressure on his right thumb, and he made hundreds of knife strokes during a day. On busy days, he could make over a thousand strokes. He not only used the knife to cut the specific cuts of meat, he also trimmed fat and unusable sections off of the meat. Once the meat was cut, plaintiff wrapped it for display.
4. While working for defendant, plaintiff developed pain at the base of his right thumb. He noticed it for years but in September 2003 the pain intensified to the point that he sought treatment at Mt. Olive Family Medicine. On September 26, 2003 he saw Peggie Parks, a physician's assistant with Mt. Olive. She treated him with anti-inflammatory medication for what appeared to be tendonitis from an overuse syndrome. Plaintiff returned to her with persistent symptoms in January and April 2004. She injected the joint at the latter appointment. Ms. Parks advised plaintiff at that time that he would need to see an orthopedic surgeon for further treatment of his thumb problem. *Page 4 
5. Consequently, on May 4, 2004 plaintiff went to Dr. de Araujo. On examination, he had symptoms associated with stress to the carpal/metacarpal (CMC) joint, and x-rays revealed arthritis at that joint. Dr. de Araujo injected the joint that day. The injection gave plaintiff sufficient relief and he did not return to the doctor until December 16, 2004. However, by the follow-up visit in December, his symptoms were interfering with his job. Dr. de Araujo injected the joint again on that occasion.
6. Plaintiff's symptoms gradually became worse over the following months and by early April he did not believe that he could continue doing his job. He returned to Dr. de Araujo on April 11, 2005 and advised that he was ready for surgery. There was a delay in scheduling the procedure due to the question of whether plaintiff's workers' compensation claim would be accepted. Defendants subsequently denied the claim, so plaintiff apparently filed his medical bills with his group health insurance.
7. On May 31, 2005, Dr. de Araujo performed surgery on plaintiff's hand. The doctor removed part of the arthritic trapezium bone and used a tendon to reconstruct the joint. Following the operation, plaintiff developed some painful scar tissue on his forearm at the site where the tendon had been harvested, and the doctor advised him to treat the area with massage and heat. His thumb was casted and then put in a splint in August.
8. Despite the surgery, plaintiff continued to experience pain and weakness. Dr. de Araujo sent him to occupational therapy and then recommended that he undergo a functional capacity evaluation because it did not appear that he would be able to return to work as a meat cutter. Plaintiff very much wanted to be able to return to work in his former capacity and wanted to know if there was an alternative treatment available, so he subsequently went to Dr. Post, a hand surgeon in Raleigh, for a second opinion. Dr. Post evaluated him on December 14, 2005 *Page 5 
and recommended a second surgical procedure to remove the remainder of the trapezium bone and to use another tendon graph to reconstruct the joint.
9. Dr. Post performed the operation on January 9, 2006. He subsequently removed the K-wire inserted during the operation and sent plaintiff for therapy in order to work on his range of motion and then on his strength. Despite the additional surgery and treatment, plaintiff continued to experience pain, weakness and limitation of motion in his hand. He also developed a tremor in the hand after the second surgery. Dr. Post ultimately released him to return to work with restrictions of no lifting more than five pounds and no repetitive forceful gripping or grasping, and he was to wear a splint.
10. Plaintiff then returned to Dr. de Araujo for further follow-up care. Dr. de Araujo was of the opinion that plaintiff would never be able to return to work as a butcher. The doctor did not know what had caused the tremor and recommended that plaintiff be evaluated by a neurologist or at the motion disorder clinic at Duke Medical Center regarding that condition. Having not improved despite two operations to his hand, plaintiff was reluctant to pursue medical evaluation and treatment. He appeared frustrated and somewhat anxious in July 2006, so Dr. de Araujo prescribed Ativan for him. Ms. Parks had also treated him earlier that year for anxiety associated with being out of work and being "cooped up" at home.
11. On September 25, 2006 when Dr. de Araujo last saw plaintiff, the doctor did not recommend any further surgical procedure to the hand for fear that it could make the tremor worse, and he recommended vocational rehabilitation to assist plaintiff in finding work which would not require much three-point pinching, exposure to cold temperatures or lifting of more than five pounds and where he could wear a brace when doing any lifting. *Page 6 
12. Defendant would not offer work to plaintiff within his restrictions at anytime prior to the hearing, and plaintiff had the impression that his employment with the company had been terminated.
13. Prior to May 31, 2005, plaintiff developed arthritis of the CMC joint of his right hand. This condition developed as a result of the repetitive, forceful use of his thumb in cutting meat at work. He was placed at an increased risk of developing the CMC joint arthritis due to his job duties as a meat cutter as compared to the general public not so employed. His job duties with defendant were a significant contributing factor in the development of his right thumb CMC joint arthritis.
14. Plaintiff has proven that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant and which excluded all ordinary diseases of life to which the general public was equally exposed.
15. As a result of his right thumb condition, plaintiff was unable to work in any capacity from May 31, 2005, when he had his first surgery, until March 28, 2006, when Dr. Post released him to light duty. He remained unable to work as a meat cutter at that time and was not expected to ever be able to return to work in that capacity. Due to his persistent symptoms, he would not be able to work in any job which would require much three-point pinching, lifting of more than five pounds or exposure to extreme temperature, and he would have to be allowed to wear a brace when doing any lifting.
16. Plaintiff had wanted to return to work as a meat cutter, since it was a job he had performed for thirty-three years, and he was showing signs of depression and anxiety because he was not able to get out and work. At the time of the hearing before the Deputy Commissioner, he was taking computer classes in order to make himself more marketable, but he could not type *Page 7 
with his right hand because of his hand condition. He had not found suitable alternative employment as of the date of the hearing before the Deputy Commissioner.
17. Plaintiff reached maximum medical improvement with respect to his CMC joint arthritis by June 12, 2006 when Dr. de Araujo rated him. However, he had developed a significant tremor in his hand by that time and the tremor was not evaluated by an expert in motion disorders to determine if it was related to his compensable condition or whether treatment would help it. Therefore, by the time the evidence closed in the case before the Deputy Commissioner, it was not clear whether plaintiff had reached maximum medical improvement with respect to all conditions arising from his occupational disease. It appears that plaintiff should undergo an independent medical evaluation regarding the tremor before a decision can be made regarding this issue.
18. Consequently, no findings are made at this time as to the extent of permanent partial disability plaintiff may sustain as a result of his occupational disease.
19. Defendants had reasonable grounds to defend this matter and were not acting out of stubborn or unfounded litigiousness.
20. As the insurer brought this appeal, the Full Commission finds the award of attorney's fees and costs pursuant to N.C. Gen. Stat. § 97-88
to be reasonable.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. As of May 31, 2005 plaintiff developed right thumb CMC joint arthritis which was an occupational disease due to causes and conditions characteristic of and peculiar to his *Page 8 
employment and which was not an ordinary disease of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53 (13);Booker v. Duke Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
2. Plaintiff is entitled to compensation for temporary total disability at the rate of $439.17 per week from May 31, 2005 through the date of hearing on September 12, 2006 and continuing thereafter until he returns to work or until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendants provide all medical compensation arising from this occupational disease, including an independent medical evaluation by a motion disorder specialist regarding the tremor, which developed in his right hand after the second operation. N.C. Gen. Stat. §§ 97-2(19); 97-59.
4. As defendants had reasonable grounds to defend this matter, and were not acting out of stubborn or unfounded litigiousness, plaintiff is not entitled to sanctions or attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
5. Section 97-88 of the N.C. General Statutes provides in pertinent part:
 If the Industrial Commission at a hearing on review . . . shall find that such hearing or proceedings were brought by the insurer and the Commission . . . by its decision orders the insurer to make, or to continue payments of benefits, including compensation for medical expenses, to the injured employee, the Commission . . . may further order that the cost to the injured employee of such hearing or proceedings including therein reasonable attorney's fee to be determined by the Commission shall be paid by the insurer as a part of the bill of costs.
See Id. As the insurer brought this appeal, the Full Commission finds the award of attorney's fees and costs pursuant to N.C. Gen. Stat. § 97-88 to be reasonable.
 *********** *Page 9 
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for temporary total disability at the rate of $439.17 per week from May 31, 2005 through the date of hearing on September 12, 2006 and continuing thereafter until he returns to work or until further order of the Industrial Commission. That portion of this compensation which has accrued shall be paid in a lump sum. This award is subject to the attorney's fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of his occupational disease, including those arising from an independent medical evaluation by a motion disorder specialist regarding his tremor.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiff's counsel. Defendants shall pay the fee from the accrued compensation and shall thereafter pay him every fourth check.
4. The plaintiff within thirty days of the entry of this Opinion and Award shall provide the Commission with an affidavit and itemized statement of hours spent in the defense of this appeal before the Full Commission. The Commission, by separate Order, will thereafter provide for fees and costs pursuant to N.C. Gen. Stat. § 97-88.
6. The defendants shall pay the costs.
This the 15th day of November, 2007
S/______________________ DANNY LEE McDONALD COMMISSIONER *Page 10 
CONCURRING:
 S/______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ BUCK LATTIMORE COMMISSIONER *Page 1